2021 IL App (1st) 160510-UB

No. 1-16-0510

Order filed February 3, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 5529 |
| | ) | |
| RAPHAEL LEVI, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Justices McBride and Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where defendant presented a colorable claim of actual innocence, we reverse the circuit court's denial of his *pro se* motion for leave to file a successive postconviction petition and remand for further proceedings under the Post-Conviction Hearing Act.

¶ 2    Following a 2009 jury trial, defendant Raphael Levi was convicted of first degree murder

of Terrance Jackson and sentenced to 60 years' imprisonment. We affirmed defendant's conviction

on direct appeal. *People v. Levi*, 2012 IL App (1st) 100379-U (unpublished order under Supreme

Court Rule 23). In 2015, defendant filed a *pro se* motion for leave to file a successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), alleging actual innocence based on newly discovered evidence that Caleb Charlston, an eyewitness to Jackson's murder, came forward and named someone other than defendant as the shooter. The circuit court denied leave to file the successive petition. We affirmed, finding that defendant failed to present a colorable claim of actual innocence because Charlston's affidavit did not constitute reliable new evidence that was so conclusive it would probably change the result on retrial. *People v. Levi*, 2019 IL App (1st) 160510-U.

¶ 3     On September 30, 2020, our supreme court denied defendant's petition for leave to appeal, but directed this court to vacate our judgment and reconsider the matter in light of *People v. Robinson*, 2020 IL 123849, to determine whether a different result was warranted. *People v. Levi*, No. 124774 (Ill. Sept. 30, 2020) (supervisory order). After reconsideration in light of *Robinson*, we find that defendant has presented a colorable claim of actual innocence, and we reverse the circuit court's judgment and remand for further proceedings under the Act. Because we set forth the facts of the case in defendant's direct appeal (*Levi*, 2012 IL App (1st) 100379-U (unpublished order under Supreme Court Rule 23)), we recite them here to the extent necessary to our disposition.

¶ 4     At trial, the State's theory of the case was that a disagreement between defendant and Jackson escalated and resulted in defendant shooting Jackson. The defense theory was that defendant was asleep at his girlfriend's residence at the time of the shooting.

¶ 5     Jackson's wife, Joyce Jackson, testified she did not know defendant but had seen him "in the neighborhood." She knew defendant's nickname was "Nudie Man" and identified him in court.

Three days before the shooting, on August 6, 2007, at around 6 p.m., Jackson was in his car picking Joyce up from his aunt's residence on the 9200 block of South University Avenue. Joyce received a call from Jackson, who was waiting in his car, telling her to "hurry up because Nudie Man and his brother are going to get him with a bat." As Joyce walked to Jackson's car, she observed Nudie Man holding a bat in his hands and standing with two other men across the street. On August 9, 2007, at around 6:45 a.m., Jackson's aunt informed Joyce that Jackson had been shot.

¶ 6     On cross-examination, Joyce testified she spoke with Detective Eileen Heffernan the day after Jackson was shot. She told Heffernan about the August 6, 2007 incident. However, she acknowledged that she did not call the police on that date because "nothing happened."

¶ 7     Curtis Moore testified that he lived on the 9200 block of South University across the street from Jackson's aunt. He owned a construction business and Jackson worked for him. Moore knew defendant as Nudie Man from the neighborhood and identified him in court.

¶ 8     On August 9, 2007, around 7 a.m., Moore instructed Jackson to park in the alley at the back of his residence before they drove to a job together. As Moore went to meet Jackson in the alley, he heard three gunshots. Moore immediately called Jackson, who stated, "Man, this n*** just shot me." When Moore asked who shot him, Jackson responded, "Nudie Man." Moore called 911 and told them that Jackson was driving to the hospital. The police arrived shortly thereafter and Moore spoke first with a plainclothes officer and later with two detectives. Moore was aware that defendant and Jackson knew each other and were "[n]ot too friendly that week."

¶ 9     On cross-examination, Moore acknowledged he could not recall whether he told a detective that Jackson named Nudie Man as his shooter. However, he clarified that he knew he told the police about his conversation with Jackson on the date of the shooting because they "went down

the street" in search of the person Moore named as the shooter. Moore emphasized that he told the police several times that Jackson said, "Man, this n*** just shot me." He also told Detective Heffernan on the date of the shooting that he spoke with Jackson on the phone and gave her the details of the conversation, including that Nudie Man was the shooter. Moore did not tell Heffernan again that Jackson named Nudie Man as the shooter because "it was clear the first time."

¶ 10   Jeffrey Bloomingberg, Jackson's cousin, testified that on the day in question, he and Jackson were working for Moore. Bloomingberg and Jackson were in Jackson's white truck that morning. They drove to Moore's house between 7 and 7:30 a.m. Jackson spoke with Moore on the phone and then parked in the alley in the back of the residence. While sitting in the alley, Jackson pointed out a "beat up," "burgundy" car that drove past and said he was fighting with the driver. Bloomingberg did not see the driver and did not know whom Jackson was talking about.

¶ 11   As the two men sat in the car, a man walked into the alley holding a silver "small automatic" gun. He walked from the passenger side of the car to the driver's side, where Jackson was seated. Bloomingberg did not know the man, but it was daylight and he got a "good look" at him. Bloomingberg identified defendant in court as the person holding the gun.

¶ 12   After approaching the driver's side of the car, defendant and Jackson began discussing a disagreement between the two of them, indicating that they knew each other. Bloomingberg did not know what the men were talking about, but defendant reacted angrily. Defendant then asked Jackson whether he had money, and Jackson responded that he had seven dollars. Defendant said that Jackson had more than seven dollars, and Jackson took his wallet out to show defendant its contents. Bloomingberg was seated in the passenger seat for the entire conversation and was looking at defendant, hoping he would not shoot the gun. After arguing about the money, defendant

"looked at [Jackson] real strangely and he shot." The first bullet missed Jackson, but defendant fired two more shots and hit Jackson in the chest. Defendant pointed his gun at Bloomingberg and retreated back into the alley.

¶ 13    Jackson subsequently called Moore and told him he had been shot. Jackson gave Moore the shooter's "street name," but Bloomingberg could not recall the nickname at the time of trial. Jackson thereafter started driving out of the alley. At 92nd Street and University, Bloomingberg switched to the driver's seat and drove Jackson to the hospital.

¶ 14    Bloomingberg spoke with police officers and told them that Jackson had named the shooter during the phone call with Moore. After speaking with the officers, Bloomingberg identified defendant as the shooter in a photographic array at approximately 9:45 a.m. on the day of the shooting. In the photograph, defendant had braided hair, but Bloomingberg clarified he did not have braids in his hair when he shot Jackson. Despite the discrepancy in hairstyles, Bloomingberg identified defendant's photo because he recognized his face. In February 2008, while Bloomingberg was in jail on a narcotics charge, he viewed a physical lineup and identified defendant as the shooter "right away." Bloomingberg acknowledged he had a prior drug conviction.

¶ 15    On cross-examination, Bloomingberg reiterated both that Jackson called Moore after he was shot, and Bloomingberg told the detectives that Jackson named his shooter during the phone call to Moore. Bloomingberg acknowledged that he was on probation at the time of the shooting and in jail when he identified defendant in a physical lineup.

¶ 16    Crystal Taylor testified she was friends with Ebony Buckley, who had a child with defendant. Taylor knew defendant as Nudie Man and identified him in court. In February 2008,

Taylor was at Buckley's residence. Buckley and defendant got into a fight and Taylor overheard Buckley say that defendant was wanted for murder. Defendant subsequently told Taylor that he "shot the dude," and Buckley threatened to turn him into the police whenever she was mad at him. When Taylor asked defendant more about the murder, defendant said he "got into it" with a "dude" and was not "gonna let the dude kill him" so he shot and killed him first. Defendant also stated he was on the news and "America's Most Wanted." He told Taylor that he planned on turning himself in but his mother was dying, and he was "waiting for somebody to sign a notarized letter."

¶ 17    At the end of February 2008, defendant called Taylor and asked her to meet him at a hotel on 79th Street and Normal Avenue. Taylor declined, called the police, and gave them defendant's whereabouts. Taylor acknowledged she did not call the police on the day she found out defendant shot someone.

¶ 18    Chicago police detective Eileen Heffernan testified that on the morning of the shooting she went to the alley where the shooting occurred and then to the hospital, where she learned Jackson had died. She spoke with witnesses at the hospital and learned that Jackson had been shot inside his car, which was parked at the hospital. Heffernan also spoke with officers at the hospital before returning to the alley where the shooting occurred. By that time, she had information about a possible suspect whose nickname was Nudie Man. She later learned Nudie Man was defendant and put out an investigative alert with defendant's name and description.

¶ 19    While attempting to locate defendant, Heffernan learned he lived at an address in Dolton, approximately a 15-minute drive from the alley where Jackson was shot. She also learned Talania Williams, defendant's girlfriend, lived at the Dolton residence. Heffernan spoke with Williams on August 10, 2007, and ascertained that she had kicked defendant out of the house on the day of the

shooting. The police were unable to locate defendant until February 2008, when they received a call from Buckley and Taylor. Following that phone call, defendant was arrested at a hotel on 79th Street. Bloomingberg subsequently made an "immediate identification" of defendant as Jackson's shooter in a physical lineup.

¶ 20    On cross-examination, Heffernan testified that when she spoke with Moore on the day of the shooting, he did not tell her that Jackson named Nudie Man as the shooter. Joyce informed her of an incident three days prior to the shooting where three men were coming toward her and Jackson with a bat, but she did not name Nudie Man as one of the men.

¶ 21    On redirect, Heffernan testified the suspect in Jackson's shooting was immediately identified after the shooting. The State then asked the following question:

> "[ASSISTANT STATE'S ATTORNEY]: When you talked to [Joyce], she did tell you that her husband said hurry up while in the car as the three men with bats approached that Nudie Man was out to get him?
>
> [WITNESS]: Yes."

¶ 22    The medical examiner testified that Jackson died from a gunshot wound to the chest.

¶ 23    For the defense, Talania Williams, defendant's girlfriend, testified that in August 2007 defendant was living with her in Dolton. He had a key to her apartment. On the day of the shooting, she saw defendant sleeping between 3 and 4:30 a.m. when she woke up. Williams woke up again around 8 a.m. and saw defendant sleeping. At some point that day, Williams woke defendant up and told him to leave her house "because it was rumored that he had killed someone." She acknowledged that she was asleep at 7 a.m. and did not know where defendant was at that time.

¶ 24 Rosie Swanigan, Williams' neighbor, testified for the defense that when she left for work between 8 and 8:30 a.m. on the morning of the shooting, she observed defendant's car, which was maroon and "really raggedy." She did not see defendant.

¶ 25 The State called Heffernan in rebuttal. Heffernan testified that in October 2007, Williams told her she woke up in her apartment between 4 and 5 a.m. and saw defendant, and woke again later between 9:30 and 10 a.m. Williams never said that she woke up at 8 a.m.

¶ 26 The jury found defendant guilty of first degree murder in which he personally discharged a firearm. The court sentenced defendant to a total of 60 years' imprisonment, including a 25-year firearm enhancement. We affirmed on direct appeal. *Levi*, 2012 IL App (1st) 100379-U (unpublished order under Supreme Court Rule 23).

¶ 27 On August 15, 2013, defendant filed an initial *pro se* postconviction petition, raising claims regarding hearsay testimony admitted at trial, jury instructions, the firearm enhancement included in his sentence, and numerous claims of ineffective assistance of trial and appellate counsel. On November 1, 2013, the circuit court summarily dismissed defendant's petition. Defendant did not appeal the dismissal.

¶ 28 On April 3, 2015, defendant mailed a *pro se* motion for leave to file a successive postconviction petition and a motion for discovery. In his petition, defendant asserted, *inter alia*, a claim of actual innocence based on newly discovered evidence. He alleged that Caleb Charlston, an eyewitness to Jackson's murder, came forward and claimed someone other than defendant shot Jackson. Defendant claimed he could not raise this issue earlier because he was not at the scene of the crime and did not know who witnessed the crime.

¶ 29    In support of his petition, defendant attached a notarized affidavit from Charlston dated February 24, 2015.[1] Charlston averred that, at around 7 or 7:30 a.m. on August 9, 2007, he was leaving his girlfriend's residence on the 9200 block of South University Avenue and witnessed Mark Cooper fire a gun at two men in a white pickup truck in the alley. Charlston feared for his life and ran to the front of the residence. He did not come forward sooner because he feared gang retaliation.

¶ 30    In his own affidavit, defendant averred that he was actually innocent and could not have discovered the eyewitness evidence sooner because he did not know Charlston and had "no way of knowing" that Charlston witnessed the crime until he contacted defendant in 2015. He further averred that he "wore long braids" at the time of the shooting and was unfairly arrested because his wife lied to police.

¶ 31    On December 17, 2015, the court denied defendant leave to file a successive postconviction petition and his motion for discovery. With respect to defendant's actual innocence claim, the court found that, even assuming the evidence in Charlston's affidavit was newly discovered and not cumulative, it was not material nor "so conclusive that it would overcome the evidence presented at trial." Specifically, the court noted that, while the testimony inculpated Mark Cooper, it did not exculpate defendant.

¶ 32    We affirmed the circuit court's denial, finding that defendant failed to present a colorable claim of actual innocence because Charlston's affidavit did not constitute reliable new evidence and was not so conclusive that it would probably change the result on retrial. *Levi*, 2019 IL App

---

[1] The first part of the affidavit uses the spelling "Charlston," but the signature on the affidavit is spelled "Charleston."

(1st) 160510-U, ¶¶ 36-37. On September 30, 2020, our supreme court denied defendant's petition for leave to appeal, but directed this court to vacate our judgment and reconsider the matter in light of *Robinson*, 2020 IL 123849, to determine whether a different result was warranted. See *Levi*, No. 124774 (Ill. Sept. 30, 2020) (supervisory order).

¶ 33    On appeal, defendant contends the circuit court erred in denying him leave to file a successive postconviction petition based on Charlston's affidavit.

¶ 34    The Act permits criminal defendants to challenge their convictions or sentences on grounds of constitutional violations. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). However, the Act generally contemplates the filing of only one petition. *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009); 725 ILCS 5/122-3 (West 2014). In order to file a successive postconviction petition, a defendant must first obtain "leave of court." See 725 ILCS 5/122-1(f) (West 2014); *People v. Tidwell,* 236 Ill. 2d 150, 157 (2010).

¶ 35    The bar against successive proceedings is relaxed only where the defendant can satisfy (1) the cause and prejudice test of the Act for failing to raise the claim earlier; or (2) the "fundamental miscarriage of justice" exception, set forth as a claim of actual innocence. 725 ILCS 5/122-1(f) (West 2014); *People v. Edwards,* 2012 IL 111711, ¶¶ 22, 23. It is the defendant's burden to obtain leave of court before further proceedings on his successive postconviction claims can follow. *Id.*, ¶ 24.

¶ 36    Where, as in this case, a defendant seeks to relax the bar against successive postconviction petitions on the basis of actual innocence, the court should deny such leave only when it is "clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Robinson*, 2020 IL 123849, ¶ 44.  In other

words, the court should grant leave to file a successive petition based on actual innocence where the successive petition and supporting documentation "raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Edwards,* 2012 IL 111711, ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). At the pleading stage, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true." *Robinson*, 2020 IL 123849, ¶ 45. We review the circuit court's denial of leave to file a successive petition *de novo*. *Id.* ¶ 40.

¶ 37   To succeed on a claim of actual innocence, a petitioner must present evidence that is (1) newly discovered, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington,* 171 Ill. 2d 475, 489 (1996)).

¶ 38   Newly discovered evidence is evidence that was discovered after trial that could not have been discovered sooner through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47.  Material evidence is evidence which is relevant and probative of the defendant's innocence. *Id.* Noncumulative evidence adds to the information that was presented to the fact finder at trial. *Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Molstad*, 101 Ill. 2d 128, 135 (1984)).

¶ 39   Taking the pleadings and supporting documents as true, as we must, we find Charlston's affidavit provides new, material, noncumulative evidence in support of defendant's actual innocence claim. Defendant averred he was not present at the shooting and was unaware of any witnesses until 2015 when Charlston contacted him. Charlston averred he did not come forward initially out of fear of gang retaliation. Defendant, therefore, could not have discovered him sooner through the use of due diligence.

¶ 40    Further, Charlston's affidavit identifies someone other than defendant as the shooter, which is probative of defendant's innocence and adds to the information that was before the jury. Charlston averred he observed Mark Cooper shoot into a white truck at the relevant date and time in the alley behind his girlfriend's residence on the 9200 block of South University Avenue. Such evidence is material to the central issue in the case, namely, the identity of the shooter. Although defendant argued at trial that he was elsewhere at the time of the shooting, the jury did not hear testimony that another witness to the shooting identified Mark Cooper, rather than defendant, as the shooter.

¶ 41    The conclusive character element of actual innocence claims refers to evidence that, when considered along with the trial evidence, would probably lead to a different result on retrial. *Coleman*, 2013 IL 113307, ¶ 96 (citing *Ortiz*, 235 Ill. 2d at 336-37). The conclusive character of the new evidence is the most important element of an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47 (citing *Washington*, 171 Ill. 2d at 489). With regard to the conclusive character element, ultimately, we must determine "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97). The new evidence is not required to be "entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 42    Here, we find Charlston's affidavit places the trial evidence in a different light. The State's evidence at trial showed Bloomingberg identified defendant as the shooter in a photo array on the

date of the shooting and in a physical lineup after defendant was arrested several months later. Several witnesses testified they knew defendant as "Nudie Man," and Moore testified that Jackson named Nudie Man as his shooter following the shooting. However, Detective Heffernan denied that Moore informed her that Jackson identified Nudie Man as the shooter. Defendant presented an alibi defense, arguing he was at his girlfriend's house at the time of the shooting. In his affidavit, Charlston names a different individual as the shooter, supporting defendant's theory of the case. Where, as here, newly discovered evidence is both exonerating and contradicts a State's witness, it is capable of producing a different outcome on retrial. *Ortiz*, 235 Ill. 2d at 336-37 (identification of different offender presents evidence that facts should be analyzed more closely to determine defendant's guilt or innocence); see also *People v. Harper*, 2013 IL App (1st) 102181, ¶ 49 (same).

¶ 43 Moreover, although Charlston's affidavit conflicts with the State's witnesses, "the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Robinson*, 2020 IL 123849, ¶ 60. To be positively rebutted, it must be "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* In this case, the record does not affirmatively demonstrate that a trier of fact could never accept the veracity of Charlston's statements.

¶ 44 Accordingly, because we find defendant has satisfied the pleading requirements for obtaining leave to file a successive postconviction petition, his claim of actual innocence must be advanced to second stage proceedings under the Act. See *id.* ¶ 85 ("the only issue presented in this case is whether [the defendant] may file his successive postconviction petition that alleges he is actually innocent of the crimes for which he has been convicted and sentenced"). We therefore

reverse the judgment of the circuit court and remand the cause for further proceedings under the Act.

¶ 45    Reversed and remanded.